Case 4:24-cv-00521-KGB  Document 3  Filed 06/20/24  Page 1 of 14

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 20 2024

TAMMY H. DOWNS, CLERK
By: _____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

FOR AR KIDS                                                    Plaintiff

v.                    Case No. 4:24cv521-KGB

TOWN OF ROSE BUD, ARKANSAS, and
SHAWN GORHAM, Mayor, Town of Rose Bud, in his official capacity     Defendants

### BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

In this case, Plaintiff challenges a hastily enacted ordinance of the Town of Rose Bud, Arkansas ("the Town"), that restricts the ability of canvassers while on public land to obtain signatures in support of proposed constitutional amendments and ballot initiatives. The Town proposes to enforce this ordinance at its upcoming Summerfest, a large event that is put on by the Town and that will be held in a public park from June 20–22. Under the terms of the ordinance, persons or entities who wish to collect signatures for petitions may do so only within the confines of booths within the festival grounds at locations of Defendants' choosing. Moreover, the ordinance forbids the collection of signatures on any public property outside the enclosure of the festival. *See* TRO Exh. A.

Despite having planned for Summerfest since January 2024, Defendants did not introduce the ordinance until Friday, June 14, six days before the festival was to begin, and did not adopt an effective ordinance until the evening of Monday, June 17, three days before the festival is to begin. As alleged in the complaint and as further explained in this brief, context and timing make clear that, despite any

1

surface neutrality, the ordinance was passed in an explicit effort to restrict the speech of canvassers who wish to ask citizens to sign ballot-question petitions, and most likely was passed to restrict the speech of certain ballot-question petitions, in particular. In any case, the ordinance, in and of itself, is not content neutral and improperly forbids speech in a public forum. For all these reasons, it violates the First Amendment.

Defendants intend to enforce the newly created ordinance at Summerfest, which begins at 4 p.m. today. Plaintiff thus requests a temporary restraining order under Fed. R. App. P. 65. Specifically, Plaintiff requests that the Court immediately enjoin Defendants from enforcing at Summerfest the ordinance or any policy restricting "political petitions."

## LEGAL STANDARD

The Court is authorized to grant a temporary restraining order under Fed. R. Civ. P. 65. The familiar *Dataphase* factors apply when assessing whether to grant a TRO. *See McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989). Under *Dataphase*, in determining whether to grant relief, a district court weighs the following four considerations: (1) the threat of irreparable harm to the moving party; (2) the movant's likelihood of success on the merits; (3) the balance between the harm to the movant if the injunction is denied and the harm to other party if the injunction is granted; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). "While no single factor is determinative, the probability of success factor is the most significant." *Kodiak Oil*

*& Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1133 (8th Cir. 2019) (internal citation and quotation omitted).

In particular, "[w]hen a Plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Phelps-Roper v. Troutman,* 662 F.3d 485,488 (8th Cir. 2011). Because "a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights," "[i]n a First Amendment case . . . the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (internal quotation marks omitted).

## ARGUMENT

All four *Dataphase* factors cut in Plaintiff's favor. For the reasons stated below, Plaintiff is likely to succeed on the merits and is able to show irreparable harm even without accounting for the special First Amendment considerations articulated above. The balance of harms favors Plaintiff and the public interest favors enforcement of First Amendment rights. The Court should thus grant a temporary restraining order prohibiting Defendants from enforcing the ordinance or from otherwise restricting Plaintiff's ability to collect signatures.

**A. Plaintiff is likely to succeed on the merits.**

Plaintiff is likely to succeed on at least three independent constitutional grounds. First, the facts demonstrate that the ordinance constitutes intentional

viewpoint discrimination against those who wish to collect ballot-petition signatures generally.as well as against specific Ballot Question Committees, including Plaintiff. Second, the ordinance is not content-neutral or viewpoint-neutral on its face because it restricts the speech of persons who wish to advocate for a ballot question but not the speech of those who wish to oppose it. Third, by prohibiting canvassers from speaking on public property outside the festival enclosure, the ordinance restricts speech in a public forum without adequate justification.

### 1. Intentional viewpoint discrimination (Claim Four)

On first blush, the ordinance may appear to be a benign regulation of solicitation within the festival grounds. It speaks to the speech of "any business or religious or political entity," so how can it be said to intentionally discriminate against particular speakers on the basis of viewpoint? However, the context in which the ordinance was passed shows that it was adopted with the purpose of suppressing the speech of canvassers who wish to collect signatures in support of ballot initiatives.

There is evidence of this discriminatory purpose in the timing of the ordinance. Defendants had been planning the festival for six months, and presumably could have foreseen any issues arising from solicitation—particularly as Defendants had hosted Summerfest before and, according to Mayor Gorham, there had been at least one complaint about political petitioning at a previous Summerfest. Yet the Town did not see fit to regulate solicitation until the week before Summerfest, *after* a

Ballot Question Committee (which appears to be Plaintiff) inquired about seeking signatures at the event. This timing is highly suspect.

But the Court need not resort to inference to discern intentional viewpoint discrimination here. Defendant Gorham made the ordinance's intent explicit in his comments at the June 14 special meeting, at which the council first attempted to pass the ordinance.

At this meeting, Gorham noted, inconsistently, that Summerfest is happy to host the speech of political *parties*, but not the speech of ballot question committees, because "this is a family environment, there is nothing political about this, this is not the type of place that you want to come and get bombarded and asked to sign a petition and read about it or anything like that." *See* TRO Exh. D. Recalling complaints that he fielded about a canvasser who appeared at a previous Summerfest, Gorham then introduced the ordinance that would restrict the speech of canvassers at the upcoming Summerfest.

If the ordinance's purpose weren't clear enough from these remarks, Gorham clarified afterwards that forbearance was extended to the canvassers only because they could not be totally banned under the law: "It is not my belief that they should be out there, that they should be allowed to be out there, or what they're doing is right. . . . I want that known, because what's on their ballot, I don't think 98 percent of the town agrees with, but there's nothing we can do, except vote the right people out and the right people in in November." *See* TRO Exh. D.

Gorham's disagreement that "what they're doing is right," and his opinion that most of the town disagrees with "what's on their ballot," suggests the targeting of specific (albeit unnamed) ballot question committees. Indeed, the Declaration of Steve Grappe, TRO Exh. E, more than suggests that Gorham was specifically targeting Plaintiff in enacting the ordinance.

But Plaintiff need not show that a specific ballot question committee was targeted, because it can easily show that the ordinance was passed to discriminate against advocacy for ballot questions more generally. Context establishes that this ordinance was not about regulating commerce or religious solicitation. Canvassers asked about how to engage citizens at the festival, and Defendants responded by confining them to a booth that would render their speech ineffective. Gorham's justifications for the ordinance were entirely focused on objections to canvassing. In this light, the reference to business" and "religious" speech appears more of a cover for discriminatory action than a true objective. Indeed the "Vendor Rules and Regulations," circulated several days before the Town passed the ordinance, provide additional evidence that the Town's purpose is to prevent political activity, as they say nothing about religious solicitation. They prohibit only "political petitions." *See* TRO Exh. B.

Viewpoint discrimination is the most odious form of speech restriction and never survives First Amendment scrutiny. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberg v. Rector and Visitors of*

6

*Univ. of Virginia*, 515 U.S. 819, 829 (1995). Accordingly, Plaintiff is likely to succeed in showing that the ordinance violates the First Amendment.

### 2. Lack of content neutrality (Claim One)

Even if the ordinance were not motivated by an improper discriminatory purpose, it would be unconstitutional because on its face it discriminates based on content, and probably based on viewpoint as well.

Again, on an initial glance, the ordinance might appear to be a content-neutral restriction on "solicitation." But analysis of the ordinance and the law governing content-based regulations shows that not to be the case.

The Supreme Court's most authoritative recent word on content-based speech regulation is *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). There, in the course of striking down an ordinance regulating signs directing drivers to events, the Court explained that a speech regulation is content-based if it "draws distinctions based on the message a speaker conveys." *Id.* at 163. The Court elaborated that some such regulations are "obvious, defining regulated speech by particular subject matter," and others are "more subtle, defining regulated speech by its function or purpose." *Id.*

The ordinance here falls into the "more subtle" category. Though couched in terms of a generally applicable solicitation prohibition, as it concerns core political speech—as opposed to commercial solicitation—the ordinance restricts speech based on its "function or purpose." In regulating only solicitations of "signatures," the ordinance functionally restricts the speech of initiative supporters, because only

7

supporters are engaged in signature gathering. Speakers who wish to oppose a ballot initiative carry out their advocacy simply by speaking. Because opponents do not attempt to solicit signatures, the ordinance leaves them free to encourage attendees to decline to sign petitions anywhere within or outside the fairgrounds, without having to rent a booth to engage in that advocacy. Indeed, by inherently favoring opponents over supporters, the ordinance inches perilously close to, if not over, the line between content and viewpoint discrimination.

The ordinance's content-based nature is further apparent from its regulation of religious speech, another core First Amendment concern. The ordinance restricts religious speech only insofar as it seeks to encourage citizens to obtain membership in a particular religious congregation or organization. It does not restrict to booths other forms of religious speech, including preaching a religious message or proselytization of religion more generally, without an appeal to membership. Again, under the ordinance, it is the "function or purpose" of the speech that determines whether it will be restricted. Speech that seeks to add to a particular flock is disfavored over speech conveying broader religious messages or advocacy for a particular religious truth.

"A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* at 165; *see also Rodgers v. Bryant*, 942 F.3d 451, 456–47 (8th Cir. 2019) (striking down panhandling ordinance as content-based). Because the ordinance is content-based, Defendants must meet

the strict-scrutiny burden to show that the ordinance "furthers a compelling government interest and is narrowly tailored to that end." *Reed*, 576 U.S. at 171. They cannot meet this burden.

The ordinance and Defendants' public comments surrounding it suggest only two asserted government interests, neither of which passes strict scrutiny.

First, the government suggests that Summerfest and similar events are supposed to be for "entertainment and fun" and were "not intended" for political speech. TRO Exh. A; *see also* TRO Exh. D ("[T]his is not the type of place that you want to come and get bombarded and asked to sign a petition and read about it or anything like that."). Though it is doubtful that the government has a compelling interest in policing fun, the ordinance is not narrowly tailored to that interest. Defendants need not segregate speakers into isolated booths to protect the people's right to party.

Second, Defendants have suggested a more serious interest to prevent "obstruct[ion] [of] pedestrian traffic flow and to ensure the orderly flow movement [sic] of people in crowded areas of the event." TRO Exh. A. Assuming that this interest qualifies as "compelling," the booth restriction for political and religious speakers is not narrowly tailored to further this goal. While Defendants might suggest that the need to stop and sign a petition threatens to impede traffic, so too does a speaker who draws attention to herself by loudly opposing a ballot initiative. So too, for that matter, do lines or distractions associated with any number of attractions at the festival, or even normal conversations between attendees, which

9

are no different in their traffic impact than a conversation between a petitioner and an attendee.

Because the ordinance is a content-based regulation (at least), and because the Defendants cannot meet their burden to satisfy strict scrutiny, Plaintiff is likely to succeed in its First Amendment claim.

### 3. Restriction of speech in a public forum (Claim Two)

Insofar as the Court finds that the ordinance is not viewpoint-neutral or content-neutral, the ordinance is unconstitutional and the Court need not consider this claim at all. But even if the ordinance were viewpoint-neutral and content-neutral, it would violate the First Amendment because it prohibits speech in a public forum without adequate justification. Though the government may be able to restrict speech *within* the festival enclosure—at least if it does so in a content-neutral manner—it may not prohibit speech in the public areas *outside* the festival enclosure. Yet the ordinance does just that.

The map included at paragraph 23 of the complaint illustrates the area in which the festival will be held. The town will erect a fence around the Rose Bud Ball Park complex, and the festival will occur within that enclosure. Entry to the festival will occur at a gate near the intersection of Baseball Field Road and School Road. After parking, attendees will approach the gate on foot along School Road, and will cross a public area, akin to a sidewalk, before reaching the gate and entering the festival grounds. *See* TRO Exh. E, ¶¶ 7–9.

The public area in front of the festival gates and the streets leading up to the entryway where pedestrians traverse by foot should be considered a traditional public forum. "Public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be public forums." *Bowman v. White*, 444 F.3d 967, 975 (8th Cir 2006) (cleaned up). And the character of these spaces is not transformed into a lesser forum by virtue of being removed from a stereotypically urban context. *See Frisby v. Shultz*, 487 U.S. 474, 480 (1988) ("Our prior holdings make clear that a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood."). Here, the public street leading up to the gates and the public area in front of the gates bear the indicia of a traditional public forum.

"The government may enforce a reasonable, content-neutral time, place and manner restriction in a traditional public forum if the restriction is narrowly tailored to serve a significant government interest and leaves open ample alternative channels of communication." *Bowman*, 444 F.3d at 975. For reasons already stated, a total prohibition on speech is not narrowly tailored to serve a significant government interest. Moreover, the ordinance does not leave open *any* channels of communication, much less "ample" ones. While speakers have a limited opportunity to engage attendees from their designated booth within the festival grounds, they have no ability to speak with people on public property outside the gates or to initiate contact with attendees at all.

Moreover, the same result should occur if the Court considers the streets and entry area to the festival a designated public forum, *i.e.*, a "nonpublic forum the government intentionally opens to expressive activity for a limited purposes such as use by certain groups or use for discussion of certain subjects." *Id.* Even if these streets and areas are not traditionally locations for speech, the Town has opened them up for that purpose by permitting them to be used to access the festival, in the manner of a typical public street or sidewalk. Moreover, this area is not the sort of "limited public forum," like a concert-hall stage, where only a particular type of speaker (*e.g.*, musicians) are welcome. *See id.* at 976. The area is open to all. Regulation of speech in a designated public forum also is subject to strict scrutiny, *see id.*, which, again, Defendants cannot satisfy. Total prohibitions of speech are not narrowly tailored.

In short, Plaintiff is likely to succeed in showing that the ordinance violates its First Amendment right to engage in speech in public areas outside the festival grounds even if the Court believes the ordinance to be content-neutral.

**B. Plaintiff will suffer irreparable harm without a temporary restraining order.**

Though, as explained earlier, First Amendment violations create irreparable harm without a showing of more, Plaintiff can show more.

The very purpose of Plaintiff's existence is to place a constitutional amendment on the November ballot. To do so, it must collect 90,704 signatures across the state of Arkansas and 1,157 signatures in White County, where Summerfest is being held. TRO Exh. E. ¶3. Plaintiff has until July 5 to collect these signatures. It is

currently about two-thirds of the way there for the statewide number; it has some work to do both statewide and in White County over the next two weeks. *See id.* ¶¶ 19–20. Summerfest is key to Plaintiff's collection efforts because it offers an opportunity to make contact with a large number of White County voters, whose signatures will contribute to both the White County total and the overall total. For Plaintiff, this is a "make or break weekend for White County." *Id.* ¶ 21. And without access to large events like Summerfest, Plaintiff will have to devote additional resources to less efficient methods for signature collection. *Id.* ¶ 20.

In short, restrictions at Summerfest mean additional expenditures of effort and resources elsewhere. This time and effort cannot be restored. And the Summerfest restrictions irreparably harm Plaintiff's ultimate goal of getting its amendment on the ballot. Whether the ordinance is in effect or not will likely mean Plaintiff's success or failure in getting the required number of signatures in White County. With only two weeks to go before signatures are due, Plaintiff is harmed by any effort to prevent it from connecting with qualified electors who might support placing Plaintiff's proposed amendment on the ballot.

## C. The balance of harms favors Plaintiff and the public interest favors relief.

The balance of the equities decidedly favor Plaintiff, particularly given the infringement on its First Amendment rights. *See Troutman,* 809 F.3d at 488. If a temporary restraining order is not granted, enforcement of the ordinance will prevent Plaintiff from exercising its right to free speech. Defendants have no legitimate interest in enforcing a statute that violates the First Amendment and

13

will not be harmed by a temporary restraining order. Enjoining the ordinance may introduce to Summerfest speech with which Defendants disagree, but it will not impede the festival. Moreover, the public interest favors the protection of First Amendment rights over the suppression of speech.

## Conclusion

Plaintiff is likely to succeed in showing that Defendants' ordinance constitutes intentional viewpoint discrimination, that the ordinance is not content-neutral, and that Defendants have improperly restricted speech in a public forum—all independent violations of the First Amendment. Plaintiff therefore respectfully requests that the Court issue a temporary restraining order that enjoins Defendants from enforcing Ordinance 2024-03 or any other policy that restricts entities or individuals from collecting signatures in support of ballot-question petitions.

Dated: June 20, 2024                    Respectfully submitted,

*[signature]*

JOHN C. WILLIAMS, ABN 2013233
Arkansas Civil Liberties
    Union Foundation, Inc.
904 W. 2nd St.
Little Rock, AR 72201
(501) 374-2842
john@acluarkansas.org